IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **MELISSA & DANIEL WILLEY,** *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Civ. No. DLB-20-161 |
| **BOARD OF EDUCATION OF ST. MARY'S COUNTY,** *et al.*, | * | |
| | * | |
| Defendants. | * | |
| | * | |

**MEMORANDUM OPINION**

This case concerns the tragic death of a high school student, Jaelynn Willey, who was shot to death by another student, Austin Rollins, in the hallway of their St. Mary's County, Maryland high school. Jaelynn's parents, Melissa and Daniel Willey, individually and as personal representatives of her estate, sued the Board of Education of St. Mary's County ("Board"), the Board of County Commissioners of St. Mary's County ("County"), several individual Board members, and various administrators, teachers, and school employees. ECF 1 & 15. The gravamen of their claims is that the defendants knew Rollins had threatened and harassed Jaelynn for months prior to her death but failed to protect her from harm. The plaintiffs assert, among other claims, that the Board violated Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), through its deliberate indifference to Rollins' sexual harassment of Jaelynn. The Board moves for summary judgment on that claim. ECF 72. The motion is fully briefed. ECF 77 & 78. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2021). For the following reasons, the Board's motion is granted.

I.      **Background**

Unless otherwise stated, the following facts are undisputed. *See generally* ECF 72-1, at 4–7; ECF 77-1, at 4–8. When the parties have not agreed on a fact, the Court cites to the relevant evidence.

From 2016 until her death in 2018, Jaelynn Willey attended Great Mills High School (GMHS), a public high school in Great Mills, Maryland. In 2017, Jaelynn had been in a relationship with Austin Rollins, which she ended in response to Rollins' abusive behavior. *See* ECF 77-4, at 17, 74–96 (police reports). After Jaelynn broke up with Rollins, he began stalking and behaving violently towards her at school and harassing her on social media despite her efforts to cut off contact. *Id.*; ECF 77-2, ¶ 9. On March 20, 2018, Rollins shot and killed Jaelynn at GMHS in the hallway before school started.

Jaelynn was a student-athlete on the school's swim team, which was coached by Troy Kroll. Kroll also taught social studies at GMHS, which had approximately 1,700 students in 2018. Jaelynn's mother, Melissa Willey, was a parent volunteer with the swim team and regularly communicated with Kroll in that capacity. In November 2017, during an all-parent swim team meeting, Mrs. Willey expressed concerns to Kroll about a boy who had been hanging around Jaelynn. The parties dispute the specifics of the conversation. Mrs. Willey states she brought the issue to Kroll's attention because he was Jaelynn's teacher and trusted coach and she wanted to ensure Jaelynn was being looked after on school property. ECF 77-2, ¶ 4. Mrs. Willey does not recall whether she mentioned Rollins' name to Kroll during the conversation, but she states she made it clear that the boy was a GMHS student. *Id.* ¶ 5. She recalls asking Kroll to "keep an eye" on Jaelynn and Kroll assuring her, "I got you." *Id.* Kroll describes the interaction as "a comment . . . in passing" and states that Mrs. Willey did not name the boy, provide any identifying details

2

about him, including whether he was a student at GMHS, or request that Kroll take any action. ECF 72-2, ¶ 6. Kroll knew all the members of the swim team and generally knew if the members were dating each other; for example, he knew when another student on the swim team asked Jaelynn to prom in March 2018. *Id.* ¶ 7. In November 2017, he knew that Jaelynn was not dating any member of the team but was unaware whether she was in a relationship with any other GMHS student. *Id.* Rollins was not on the swim team.

Mrs. Willey remembers having two additional conversations with Kroll about the same topic. *Id.* ¶¶ 6–7. She states the first took place shortly after Christmas break. *Id.* ¶ 6. During this conversation, she reiterated her request that Kroll keep an eye on Jaelynn at school, particularly at lunch when the boy might be around her. *Id.* She does not recall whether she mentioned Rollins' name to Kroll during this conversation. *Id.* She remembers raising her concerns with Kroll on at least one other occasion, but she cannot recall precisely when. *Id.* ¶ 7. Similarly, she is certain she provided Rollins' name to Kroll at some point, but she cannot remember when she did so. *Id.* ¶ 8; ECF 72-3, ¶ 2. Kroll states he did not discuss with Mrs. Willey her concerns about the boy following their conversation in November. ECF 72-2, ¶ 6. He denies ever being told the boy's name. *Id.* ¶¶ 11–15.

During the 2017–2018 school year, members of the swim team, including Jaelynn, would hang out in Kroll's classroom before the start of classes. While hanging out, Jaelynn and her friends talked about Rollins' escalating harassment towards Jaelynn. ECF 72-4 (16:1 – 17:6); ECF 77-2, ¶ 10. Kroll recalls students would talk to each other in his classroom before school, but he states he was not close enough to hear their conversations and was focused on preparing to teach his first class each day. ECF 72-2, ¶¶ 9–10. He denies that Jaelynn, her friends, or other members of the swim team ever shared concerns with him about Jaelynn's involvement with Rollins. *Id.* ¶¶

3

11, 13. He disclaims any personal knowledge of Rollins, including any knowledge about his appearance or social relationships. *Id.* ¶¶ 14–15. He states he never heard anyone mention Rollins' name before the shooting. *Id.* In an interview, two of Jaelynn's friends stated Kroll was "just kind of in the room when [they] would be discussing" Rollins in the mornings, but that they did not know whether Kroll was listening to them because he was "more interacting with [other teachers who were present] than with" the students. ECF 72-4 (15:2–19). Jaelynn's friends denied that Jaelynn ever talked to Kroll specifically about Rollins. *Id.* (14:9–14).

Jaelynn's parents never discussed Rollins or his behavior towards Jaelynn with Jake Heibel, the GMHS principal; James Scott Smith, the St. Mary's County Public Schools superintendent; F. Michael Wyant, the chief of safety and security for St. Mary's County Public Schools; or any elected members of the Board. As for Jaelynn, her friends stated there was no authority figure other than Kroll to whom she might have talked about Rollins. ECF 72-4 (17:13–17). They described Jaelynn as "quiet" and "kind of the person who just didn't wanna bug people with [her] problems." ECF 72-4 (17:13–22).[1]

The plaintiffs filed their complaint on January 17, 2020. ECF 1. Over the next several months, they filed an amended complaint and a second amended complaint. ECF 7 & 15. The Board, the individual Board members, and Kroll and Heibel filed three separate motions to dismiss the second amended complaint on September 10, 2020. ECF 22–24. The County and Deputy Blaine Gaskill, a school security officer, joined those motions. ECF 32 & 33. The Court resolved

---

[1] The plaintiffs admit they never contacted Heibel, Smith, Wyant, or any Board members. ECF 77-1, at 8. They state they "do not possess information that may be forthcoming about what communications, advisements, and/or exchanges Jaelynn herself may have had with school officials, including elected Board members." *Id.* However, they do not identify additional discovery that they anticipate will produce such information, and they did not submit a Rule 56(d) affidavit or declaration to explain why they cannot present facts related to the knowledge of these individuals to justify their opposition.

the motions on August 30, 2021 and dismissed the claims against the individual defendants. ECF 36. The Board and the County filed answers to the surviving claims, including the Title IX claim against the Board. ECF 38 & 39. On September 13, 2021, the plaintiffs moved for leave to amend their complaint to reassert several of the claims that had been dismissed without prejudice. ECF 40. While that motion was pending, the Court permitted the plaintiffs and the Board to exchange written discovery and take depositions of the plaintiffs, Board designees, and current and former GMHS students. ECF 59. The Board has moved for summary judgment on the Title IX claim.[2]

**II.     Standard of Review**

Summary judgment is appropriate when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To meet its burden, the party must identify "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" in support of its position. Fed. R. Civ. P. 56(c)(1)(A). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). The Court must "view the evidence in the light most favorable to the nonmoving party" and avoid "weigh[ing] the evidence or mak[ing] credibility determinations." *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017) (quoting *Jacobs v. N.C. Admin. Off. of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015)) (internal quotation marks omitted). However, the Court also must abide by its "affirmative obligation . . . to prevent factually unsupported claims and defenses from

---

[2] This case was reassigned to the undersigned on December 12, 2022, after the Honorable Paul W. Grimm retired.

proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993) (quoting *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987)) (internal quotation marks omitted).

If the moving party demonstrates "an absence of evidence to support the nonmoving party's case," the burden shifts to the nonmoving party to "present specific facts showing that there is a genuine issue for trial." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015). A factual dispute is genuine only where there is sufficient evidence to permit a reasonable jury to find in the nonmoving party's favor. *Id.*; *see also Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205 (4th Cir. 2019). "To create a genuine issue for trial, 'the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence.'" *Humphreys & Partners Architects*, 790 F.3d at 540 (quoting *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013)).

### III. Discussion

#### A. Timing of the Motion for Summary Judgment

As a preliminary matter, the plaintiffs argue the Board violated a court order by prematurely filing a motion for summary judgment. They point to an October 4, 2021 paperless order memorializing a Rule 16 telephone conference. *See* ECF 54. In the order, the Court addressed the parties' proposed modifications to the scheduling order, instructed the parties to confer regarding disputes over the depositions of non-party witnesses, and stated, "until the motion for leave to amend is resolved, no further dismissal motions shall be filed." *Id.*

The command not to file "dismissal motions" until the plaintiffs' motion for leave to amend is resolved does not apply to the Board's post-discovery summary judgment motion. It is limited to motions to dismiss, which the Court prohibited because it would have been inefficient for the parties to move to dismiss a complaint the plaintiffs wanted to amend.

Even if the bar on "dismissal motions" applied to a summary judgment motion filed after Court-ordered discovery, the Court will not deny the motion on those grounds. There is no reason to delay ruling on the motion. The plaintiffs suggest "the parties have been awaiting the resolution of" the motion for leave to amend "so that discovery can be taken and motions . . . directed at and consistent with the scope of causes of action in the operative pleading" can be filed. ECF 77-1, at 10. They also argue they have relied on the order prohibiting dismissal motions and that it "would be prejudicial in the extreme" to consider the motion for summary judgment while they have proceeded on the understanding "that the future course of this litigation will depend on the outcome" of the motion for leave to amend. *Id.* at 10–11. These arguments are not persuasive. The parties have engaged in discovery related to the Title IX claim, and the plaintiffs do not identify any additional discovery they need before the Court rules on the summary judgment motion. The motion for leave to amend will be resolved today in a separate memorandum opinion. So, there is no reason to delay a ruling on the summary judgment motion.

**B. Title IX**

Title IX provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a). "[S]tudent-on-student sexual harassment, if sufficiently severe, can . . . rise to the level of discrimination actionable under" Title IX. *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999). To establish a Title IX claim based on student-on-student sexual harassment, a plaintiff must show that:

(1) they were a student at an educational institution receiving federal funds;

(2) they suffered sexual harassment that was so severe, pervasive, and objectively offensive that it deprived them of equal access to the educational opportunities or benefits provided by their school;

(3) the school, through an official who has authority to address the alleged harassment and to institute corrective measures, had actual notice or knowledge of the harassment; and

(4) the school acted with deliberate indifference to the alleged harassment.

*Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 263–64 (4th Cir. 2021).

The Board's challenge focuses on the third element, which requires that an "appropriate person" have actual notice of the harassment. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998). An "appropriate person" is "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the [funding] recipient's behalf . . . ." *Id.*; *see also Doe*, 1 F.4th at 266 (defining "appropriate person" as "a school official with authority to address complaints of sexual harassment and to institute corrective measures"). The Board argues the plaintiffs cannot prove an "appropriate person" knew Rollins harassed Jaelynn. The plaintiffs respond that Kroll knew about the harassment and could have addressed it and taken corrective measures on the Board's behalf.[3]

The Fourth Circuit has not addressed whether a high school teacher or coach may be an "appropriate person" under Title IX, but the court has provided some guidance on who is "an appropriate person." In *Baynard v. Malone*, the court held a school principal was not an "appropriate person" because she could not take corrective measures on the school district's

---

[3] Kroll is the only individual whom the plaintiffs discuss in their briefing. They do not assert that Heibel, Smith, Wyant, or any members of the Board were "appropriate persons" who knew about the harassment. Indeed, the plaintiffs admit they never told these individuals about the harassment, and they offer no evidence that anyone else told them. Additionally, two of Jaelynn's friends said they did not believe Jaelynn ever informed any authority figure about the harassment. The Court finds there is no genuine dispute of material fact that Heibel, Smith, Wyant, and the elected Board members, whether or not they were "appropriate persons," did not know about the harassment.

8

behalf. 268 F.3d 228, 238–39 (4th Cir. 2001). The court described the necessary corrective measures as "the powers that would make a principal the proxy of the school district: the power to hire, fire, transfer, or suspend teachers." *Id.* at 239. In Virginia, those powers were reserved for the school district and not conferred on the principal. *Id.* The court concluded, "Virginia has made an explicit policy decision that school principals do not exercise the powers of an employer on behalf of the school district." *Id.* This was so even though "the principal is responsible for supervising teachers and evaluating employee performance" and could recommend disciplinary actions. *Id.* Although *Baynard* concerned alleged misconduct by a teacher, not peer-on-peer harassment, the court's analysis is informative here.

In addition to *Baynard*, the Board cites several out-of-circuit cases in support of its argument that Kroll could not take appropriate corrective measures in response to Rollins' harassment of Jaelynn. The most on-point of the Board's authorities is *Kesterson v. Kent State University*, 967 F.3d 519 (6th Cir. 2020). In that case, the Sixth Circuit held that university employees, including coaches, a counselor, and the executive director of the university's Women's Center, were not "appropriate persons" because the plaintiff "offered no evidence that these individuals could act on [the university's] behalf." *Id.* at 529. The court was not persuaded by the plaintiff's argument that the employees could report up the chain and help locate existing resources for victims of harassment because the "ability to mitigate hardship or refer complaints does not make [one] an 'appropriate person.' Otherwise, every employee would qualify and schools would

9

face a form of vicarious liability that Title IX does not allow." *Id.* at 528.[4] The university employees in *Kesterson*, the Board argues, are indistinguishable from Kroll. The Board points to the Maryland statute governing the discipline of public-school students, which authorizes principals to suspend and expel students and does not authorize teachers to do so. *See* Md. Code Ann., Educ. § 7-305(a)(1).

In response, the plaintiffs cite only *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), the foundational Supreme Court case on liability under Title IX for peer-on-peer harassment. In *Davis*, the plaintiff alleged she had raised peer-on-peer harassment with several teachers, at least one of whom contacted the principal. *Id.* at 633–35. She also alleged she spoke to the principal directly about the harassment and received a dismissive response. *Id.* at 635. The Supreme Court held deliberate indifference to peer-on-peer harassment could give rise to liability for Title IX funding recipients and allowed the claim to proceed. *Id.* at 643–44, 653–54. The plaintiffs argue *Davis* supports the conclusion that teachers may be "appropriate persons" because the teachers in *Davis* were on notice of the harassment.

*Davis* does not support the plaintiffs' position. The Court did not discuss who is an "appropriate person" under Title IX and did not hold that the teachers in that case were "appropriate persons." The allegations did involve teachers who were told about the harassment, but the Court, in summarizing why the claim could proceed against the school board, focused on the knowledge of the school administrators and did not mention the teachers. After noting there

---

[4] In the Sixth Circuit, an "appropriate person" is "someone 'high enough up the chain-of-command' that her decision constitutes the school's decision." *Kesterson*, 967 F.3d at 529 (quoting *Hill v. Cundiff*, 797 F.3d 948, 971 (11th Cir. 2015)). The Fourth Circuit has not used similar language, but in *Baynard*, it too focused on the ability of the individual to act on behalf of the funding recipient. *See Baynard*, 268 F.3d at 238–39; *see also Gebser*, 524 U.S. at 290 (requiring the ability "to institute corrective measures *on the recipient's behalf*") (emphasis added).

were multiple victims "who were sufficiently disturbed to seek an audience with the school principal," the Court held that the plaintiff "may be able to show both actual knowledge and deliberate indifference on the part of the Board[.]" *Id.* at 653–54. Indeed, as the Sixth Circuit noted in *Kesterson*, "[e]very mention of 'actual knowledge' in [*Davis*] is tied to district administrators, not school employees." 967 F.3d at 528; *see Davis*, 526 U.S. at 648–51 (referring to "school administrators" and "district administrators").

Whether an individual, regardless of job title, could take appropriate corrective measures on behalf of a school board depends on the facts of the case. *See Gebser*, 524 U.S. at 290; *Baynard*, 268 F.3d at 238–39. This court has observed that, "in the context of peer-on-peer sexual harassment, informing a classroom teacher . . . *may* be considered adequate notice." ECF 36, at 15 (emphasis added). Here, the plaintiffs do not explain what corrective measures Kroll was authorized to take in response to his purported knowledge of the harassment. He did not have the authority under Maryland law to discipline Rollins. *See* Md. Code Ann., Educ. § 7-305(a)(1). Even if he had the ability to report harassment to school administrators who could discipline students, the ability to report to higher-ups cannot be an adequate corrective measure because so holding would dramatically expand liability under Title IX—any school employee can report up the chain. *Kesterson*, 967 F.3d at 528; *see also Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d 351, 361 (5th Cir. 2020) (rejecting argument that "would result in nearly every district employee being covered" as "incompatible with Title IX's existing liability framework"); *Plamp v. Mitchell Sch. Dist. No. 17-2*, 565 F.3d 450, 458–59 (8th Cir. 2009) ("Title IX does not contemplate a definition of 'corrective measures' so broad as to include the mere ability to report suspicions of discriminatory conduct to someone with the authority to stop the abuse or control the harasser."). So holding also would conflict with the Fourth Circuit's ruling in *Baynard* that a person who could

recommend but not impose discipline was not an "appropriate person." 268 F.3d at 239. Even though the principal in *Baynard* could report the harassment up the chain, she did not have powers that would have made her "the proxy of the school district." *Id*. The same is true for Kroll.

Under Title IX, the Board is liable "for its own official decision[s]" and not "its employees' independent actions." *Gebser*, 524 U.S. at 290; *see also Davis*, 526 U.S. at 643 (explaining the "high standard imposed in *Gebser*" sought to eliminate any risk of vicarious liability). The Court concludes Kroll was not an "appropriate person" and, thus, that the Board did not have actual notice or knowledge of the harassment.[5] *See Kesterson*, 967 F.3d at 528–29; *Doe*, 964 F.3d at 361 n.39 (noting "teachers, coaches, and school employees are not generally 'appropriate individuals' for purposes of notice under Title IX"); *Hill*, 797 F.3d at 971 (holding teacher's aide was not an "appropriate person" when no evidence in the record suggested she had "the authority to discipline students for sexual harassment"); *Plamp*, 565 F.3d at 458 (holding teachers were not "appropriate persons" when there was no evidence they "had control over" the harassing student or "were vested with special remedial authority regarding sexual-harassment claims generally").[6]

The Board is entitled to judgment as a matter of law on the Title IX claim.

---

[5] There is a genuine dispute of fact regarding Kroll's knowledge of the harassment. While Kroll denies having any knowledge of Rollins prior to the shooting, Mrs. Willey states she informed Kroll on three occasions that a male student was harassing Jaelynn at school and named Rollins during at least one of the conversations. A reasonable jury could conclude from Mrs. Willey's testimony that Kroll was sufficiently on notice of the harassment. But because Kroll is not an "appropriate person," the factual dispute is not material.

[6] In holding the Title IX claim survived the Board's motion to dismiss, this Court said the ability to "report harassment to higher-ups . . . or to request that an investigation be initiated" could render an individual an "appropriate person" even if that person did not have disciplinary authority. ECF 36, at 15 n.9. However, the Court also noted the plaintiffs alleged Kroll had in fact reported the harassment to his superiors and that administrators directly observed the harassment, allegations ultimately unsupported by the evidence. *Id.* at 16. To the extent the Court held Kroll may be an "appropriate person" because he could report harassment or request an investigation, the holding is inconsistent with the cases discussed above and not followed here.

## IV. Conclusion

The Board's motion for summary judgment is granted.  A separate order shall issue.

Date:  June 5, 2023

                                             Deborah L. Boardman
                                             United States District Judge